UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COMMERCIAL UNION MIDWEST
INSURANCE COMPANY,
                    *Plaintiff-Appellee,*

v.                                            No. 01-2233

CANDACE J. WEST; JAMES L. WEST;
VICKY WEST,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-00-530-5-F3)

Argued: April 4, 2002

Decided: July 26, 2004

Before WILKINS, Chief Judge, and WIDENER and
KING, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** James Cameron MacRae, Jr., MACRAE, PERRY, WIL-
LIFORD & MACRAE, L.L.P., Fayetteville, North Carolina, for
Appellants. Dana Hefter Davis, YOUNG, MOORE & HENDERSON,
P.A., Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Commercial Union Midwest Insurance Company (Commercial Union) filed this declaratory judgment action against James and Vicky West and their daughter, Candace (collectively, "the Wests"). Commercial Union sought a declaration that the Wests were entitled to only $100,000 of underinsured motorist (UIM) coverage under automobile insurance policies issued by Commercial Union. The district court agreed and granted summary judgment to Commercial Union. For the reasons set forth below, we reverse and remand.

### I.

The facts are undisputed. In 1994, James West purchased automobile insurance from independent agent Belivia Autry. At that time, Mr. West signed a selection form opting for UIM limits of $100,000 per person and $300,000 per accident. Although Commercial Union was not the insurer in 1994, the policy was rolled over to become Commercial Union policy number PZ-Z3239375 ("the 75 policy") on June 23, 1997. The Wests renewed this policy on June 23, 1998 and on June 23, 1999.

As of June 1999, the Wests owned four vehicles, all of which were insured under the 75 policy. In July 1999, Mrs. West purchased a fifth vehicle, a 1999 Ford Mustang, for Candace. Mrs. West telephoned Autry from the dealership and asked to "add" the Mustang to the Wests' policy. J.A. 231. Mrs. West informed Autry that the Wests wanted the same insurance coverage on the Mustang as on their other vehicles. Autry did not specifically ask Mrs. West about UIM coverage.

In July 1999, Commercial Union's processing system could not accommodate more than four vehicles per automobile insurance pol-

icy. Additional vehicles had to be shown on separate documents. Accordingly, Commercial Union issued policy number PZ-Z420998R ("the 8R policy") to the Wests covering the new Mustang. In addition to having a different policy number, the 8R policy was billed separately from the 75 policy. The Wests received a declaration page for the 8R policy showing that the premium for this policy covered bodily injury liability, property damage, and medical payments. The declaration page did not show a premium for UIM coverage and, in fact, none was charged.

On August 23, 1999, the Wests paid the first quarterly premium payment on the 8R policy. However, after the Wests failed to make another payment on the 8R policy, Commercial Union cancelled it effective November 13, 1999. The following day, Candace was injured when an automobile in which she was a passenger—which was not owned by the Wests—was involved in an accident. The driver's insurer paid its liability limits of $25,000 to Candace and, thereafter, Commercial Union paid her its UIM limit of liability under the 75 policy—$100,000 minus credit for the driver's $25,000, for a total of $75,000.[1]

In December 1999, Autry learned of Candace's injuries and asked Commercial Union whether a replacement policy could be issued that would relate back to the effective cancellation date of the 8R policy. Commercial Union thereafter issued replacement policy number PZ-Z4559996 ("the 96 policy") with coverage identical to that of the cancelled 8R policy. Autry did not ask whether the Wests wished to purchase additional UIM coverage and no new coverage selection form was completed.

Commercial Union subsequently filed this action seeking a declaration that it was not obligated to pay Candace an additional $100,000 of UIM coverage under the 96 policy. The Wests responded that not only was Candace entitled to an additional payment but that the amount of UIM coverage under the 96 policy was actually $1 million. This was so, the Wests argued, because Commercial Union failed to

---

[1]Commercial Union has never disputed Candace's entitlement to UIM coverage under the 75 policy.

require them to make an election regarding UIM coverage when it issued the 96 policy.

Following discovery, the parties cross-moved for summary judgment. The district court granted summary judgment to Commercial Union, reasoning that the 96 policy (and the 8R policy before it) was simply an extension of the 75 policy, not a separate policy. Because UIM coverage is issued on a per-policy basis, the conclusion of the district court that there was only one policy was fatal to the Wests' claim.

## II.

We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the Wests. *See Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 190 F.3d 252, 255 (4th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

The Wests' claim of entitlement to additional UIM rests largely on a provision of North Carolina law that allows "stacking" of UIM coverage provided by different insurance policies. *See* N.C. Gen. Stat. § 20-279.21(b)(4) ¶2 (2003). They maintain that the 96 policy is not simply an extension of the 75 policy, but rather is a new and separate policy, under which they are entitled to additional UIM coverage.

As support for their claim, the Wests point to *Iodice v. Jones*, 522 S.E.2d 593 (N.C. Ct. App. 1999), in which the North Carolina Court of Appeals addressed a factually similar dispute. There, the plaintiffs owned three vehicles that were insured by GEICO. When the plaintiffs purchased a fourth vehicle, GEICO informed them that "the maximum number of vehicles which GEICO could maintain on a single policy was three, and that in order to cover [the] fourth vehicle, GEICO would need to issue a second policy." *Id.* at 594 (internal quo-

tation marks omitted). The two policies had different numbers and different renewal dates. The court rejected GEICO's claim that the second policy was merely an extension of the first, necessitated by the limitations of its internal processing system. Relying on the facts that the policies had different numbers and different billing dates, the court concluded that they were, in fact, separate policies. *See id.* at 596.

We conclude that *Iodice* is controlling. Here, as in *Iodice*, the two policies in question had different numbers and different billing dates.[2] Moreover, Commercial Union cancelled the 8R policy, but not the 75 policy, for nonpayment. We are unaware of, and the parties do not direct us toward, a way in which an insurer can cancel a portion of a single policy.

Commercial Union's attempt to distinguish *Iodice*—on the basis that the second policy in *Iodice* listed UIM coverage on the declarations page and the plaintiffs paid a premium for such coverage—is unavailing. At best, this fact creates an ambiguity regarding whether there was one policy or two. Under firmly established North Carolina law, ambiguities in insurance policies must be resolved against the insurer. *See id.* (citing *Brown v. Lumbermans Mut. Cas. Co.*, 390 S.E.2d 150, 153 (N.C. 1990)).

### B.

Having determined that Commercial Union issued two separate insurance policies to the Wests, we turn to the question of the amount of any additional UIM coverage under the 96 policy. For the reasons set forth below, we conclude that the Wests are entitled to an additional $100,000 in UIM coverage.

North Carolina law requires that automobile insurance policies issued in North Carolina exceeding statutory minimum coverage limits and providing uninsured motorist coverage provide UIM coverage in not less than the amount specified by statute for bodily injury lia-

---

[2]Indeed, unlike in *Iodice*, the policy numbers at issue here are not even similar. *Cf. Iodice*, 522 S.E.2d at 596 (noting that policy numbers were 367-90-75 and 367-90-75-1).

bility and not more than $1 million, as chosen by the policy holder. *See* N.C. Gen. Stat. § 20-279.21(b)(4) ¶1. The policy holder may reject UIM coverage but must do so in writing. *See id.* ¶¶6, 7. When an insured has not submitted a written rejection of UIM coverage and the policy does not specify the amount of such coverage, North Carolina law provides that "the amount of [UIM] coverage shall be equal to the highest limit of bodily injury liability coverage for any one vehicle in the policy." *Id.* ¶ 6. Here, the parties agree that this limit is $100,000. Accordingly, that is the amount of UIM coverage to which the Wests are entitled.[3]

### III.

For the reasons set forth above, we reverse and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[3]The Wests maintain that if they had been given the opportunity when purchasing the 8R policy, they would have opted for $1 million in UIM coverage. Even if this is so, it is irrelevant under the governing statute. In any event, the only available evidence—Autry's deposition testimony—contradicts the Wests' claim. Autry testified that she asked Mrs. West if she wanted the same coverage on the Mustang as the Wests had on their other vehicles, and Mrs. West responded affirmatively. This "same coverage" would have included the $100,000/$300,000 UIM coverage provided by the 75 policy.